**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Vachueyee V.                                    Case No. 22-cv-1474 (KMM/DJF)

                    Plaintiff,

v.                                              **REPORT AND**
                                                **RECOMMENDATION**

Kilolo Kijakazi,
*Acting Commissioner of Social Security*,

                    Defendant.

    Pursuant to 42 U.S.C. § 405(g), Plaintiff Vachueyee V. ("Plaintiff") seeks judicial review of the Commissioner of Social Security's ("Commissioner") final decision denying his applications for disability insurance benefits and supplemental Social Security income under Titles II and XVI of the Social Security Act ("Decision"). This matter is before the Court on the parties' cross-motions for summary judgment. The undersigned considers the motions pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1. For the reasons below, the Court finds substantial evidence on the record as a whole supports the Commissioner's Decision. The Court recommends Plaintiff's motion for summary judgment (ECF No. 20) be denied, the Commissioner's motion for summary judgment (ECF No. 23) be granted, and the Decision be affirmed.

## BACKGROUND

### I.    Procedural History

    Plaintiff applied for disability insurance benefits ("DIB") and supplemental Social Security income ("SSI") on February 25, 2020, alleging disability as of November 15, 2019. (Soc. Sec.

Admin. R. (hereafter "R.") 714, 721.)[1]  Plaintiff identified chronic kidney disease, gout, herniated disc, depression, and anxiety as disabling conditions.  (R. 749.)  In his Function Report, Plaintiff stated that he could only walk 75 feet with crutches before needing a break.  (R. 808.)  At the time of his application, Plaintiff was 35 years old (R. 714), had completed four or more years of college with specialized training in auto mechanics (R. 750), and had past work as an automobile service manager and automobile mechanic (R. 563, 750, 798).

The Commissioner denied Plaintiff's application initially (R. 640) and on reconsideration (R. 647, 651).  At Plaintiff's request (R. 655-656), an Administrative Law Judge ("ALJ") held a telephonic hearing on March 25, 2021, during which Plaintiff appeared with his attorney (R. 539- 566).  Plaintiff and a vocational expert testified (R. 539).  The ALJ issued a written decision on June 1, 2021, finding Plaintiff not disabled and denying his claim.  (R. 11-23.)  On March 31, 2022, the Social Security Administration Appeals Council denied Plaintiff's request to review the ALJ's decision.  (R. 1- 7.)  Plaintiff filed this action on June 1, 2022.  (ECF No. 1.)

Plaintiff argues:  (1) the ALJ erred by failing to properly evaluate the medical opinion of his treating physician, Dr. Shehla Kamal, when determining Plaintiff's residual functional capacity ("RFC")[2] (ECF Nos. 21 at 7-11; 26 at 1-3); and (2) the ALJ's findings are not based on substantial evidence (ECF Nos. 21 at 9-11; 26 at 1-3).  Plaintiff asks the Court to reverse the Commissioner's Decision and award benefits, or in the alternative, remand the case for further proceedings before the Commissioner.  (ECF No. 21 at 12; ECF No. 26 at 1, 4.)  The Commissioner maintains that

---

[1]  The Social Security administrative record (R.) is filed at ECF No. 16.  For convenience and ease of use, the Court cites to the record's pagination rather than the Court's ECF number and page.

[2]  RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

the Court should affirm the decision because the ALJ correctly evaluated the evidence and substantial evidence supports the ALJ's findings.  (*See generally* ECF No. 24.)

## II.    Medical Evidence

The Court summarizes the facts of record only to the extent helpful for context or necessary for resolution of the specific issues presented in the parties' briefs.  This summary describes Plaintiff's medical history related to chronic pain, gout, kidney disease, and certain visits with Dr. Shehla Kamal.  The Court also addresses Dr. Kamal's medical opinions and prior administrative medical findings.

### A.    Plaintiff's Medical History

#### 1.    Pain and Gout-Related Treatment

On November 17, 2018, about one year before the alleged onset date of his disability, Plaintiff sought treatment in an emergency room for increasing knee pain after a long walk earlier that week.  (R.  836.)  On November 20, 2018, Plaintiff followed up at a sports medicine clinic, where Dr. Steven Greer diagnosed Plaintiff with left knee pain and internal derangement of his left knee.  (R. 841.)  Plaintiff's medical notes reflect that he was using crutches and unable to bear weight.  (R. 836.)  Dr. Greer noted Plaintiff: (1) had a history of gout in his foot but not in his knee; (2) had diminished range of motion in his hip, ankle, and knee; and (3) could not bear weight on his leg.  (R. 836, 840.)  Dr. Greer aspirated Plaintiff's knee, prescribed medication for pain relief, and scheduled magnetic resonance imaging ("MRI").  (R. 841.)  Plaintiff returned to the clinic the next month.  At that time Dr. Greer diagnosed him with gout in his left knee, gave him a steroid injection, and referred him to an orthopedic surgeon.  (R. 844-846.)

On March 25, 2019, Plaintiff sought treatment in a medical clinic for pain in his left shoulder.  (R. 850.)  Plaintiff reported that: (1) his pain was worse at night and when he engaged

in overhead activity, reaching, and lifting; (2) the pain was sharp and deep; (3) associated symptoms included numbness that radiated to his fingers; (4) the pain occurred about one time per week and lasted for a short period; (5) the pain remained unchanged; and (6) past therapies included physical therapy, home exercise, pain medication, and two previous shoulder injections; and (7) he worked on cars and continued to work through the pain. (R. 850.) Dr. Heather Cichanowksi examined Plaintiff and noted a full range of motion in his cervical spine and shoulder. (R. 852.) An x-ray showed a small amount of fluid in his subacrominal sub-deltoid recess. (R. 853.) Dr. Cichanowski determined Plaintiff's pain likely resulted from some functional impingement with scap dyskinesis and scheduled him for a steroid injection. (R. 853.) Plaintiff returned to the clinic on April 1 and reported his pain remained the same and over-the-counter medicine was not helping. (R. 857.) Dr. Cichanowksi examined Plaintiff again and noted he did not have shoulder pain with his neck range of motion. (R. 858.) Plaintiff had a steroid injection in his shoulder on April 17, 2029 and reported the next month that it "helped take about 70% of his pain away." (R. 867.) Upon examination, Dr. Cichanowksi noted 5/5 strength throughout his shoulder with only mild or no pain. (R. 867.)

On July 9, 2019, Plaintiff visited an emergency room after sustaining an injury to his foot earlier that week. (R. 1446.) His treating physician prescribed pain medicine and crutches. (R. 1447.) Plaintiff returned to the emergency room the next month for pain in his lower back that began immediately after he bent to pick up a 60-pound battery. (R. 1451.) Plaintiff reported some tingling in his thighs, limited range of motion, pain with range of motion, and that over-the-counter pain medicine provided only minimal relief. (R. 1451.) His treating physician diagnosed his pain as consistent with low back strain with noted spasm and prescribed pain medicine. (R. 1452.)

4

On December 26, 2019 and January 3, 2020, Plaintiff visited an emergency room for pain in his back. (R. 975, 980-981.) Plaintiff reported that the pain was intermittent and would appear for 2-3 months and then go away. (R. 958.) Upon exam, Plaintiff's care provider noted he had intact motor strength and sensation throughout. (R. 979.) A computerized tomography scan identified an L5-S1 disc herniation with moderate to severe right lateral recess stenosis. (R. 975, 979.) An MRI subsequently identified degenerative disc disease of Plaintiff's lumbar spine at the L3-S1 levels with herniation at the L5-S1 level with mild foraminal narrowing. (R. 959, 1197.) The MRI did not show a spinal cord or nerve root impingement. (R. 1197.) During a physical exam on January 10, 2020, Plaintiff's care provider noted that he walked with an antalgic gait because of pain and that pain made it difficult for him to rise from a seated position. (R. 972.)

In January 2020, Plaintiff started physical therapy to assist with his lower back pain, muscle weakness, and decreased range of motion of his trunk and back. (R. 957.) Documentation from Plaintiff's physical therapy appointments reflects that he experienced ongoing pain in his back while attempting various exercises. (*See, e.g.*, R. 945, 947, 956, 1314.) In March 2020, Plaintiff rated his back pain as about a 3 (or 4-5 with activity) on a scale of 1 to 10, with 10 being most severe, and stated his back pain felt "60% improved." (R. 1081.)

In July 2020, Plaintiff visited a medical clinic for pain in his feet related to gout. (R. 1296.) Plaintiff's treating physician did not observe any swelling or rash on Plaintiff's feet. (R. 1296.) The physician adjusted Plaintiff's prescribed medication and advised him to follow up with his nephrologist. (R. 1296.) The next month, Plaintiff called a nurse triage line to report pain related to a "a new gout flare." (R. 1292.) Plaintiff said his feet were swollen and red and he felt unbearable pain in the bottoms and tops of his feet that had started 72 hours earlier. (R. 1292.) An x-ray of a toe on Plaintiff's right foot showed no visible erosions, but it did show an area of

mineralization along the medial aspect of his first MTP joint. (R. 1375-1376.) In September 2020, Plaintiff again sought treatment for gout-related pain that was affecting his foot. (R. 1350-1352, 1562-1564.) Plaintiff described the pain as moderately severe. He explained that the pain was sharp, worse at night, and had started several weeks before. (R. 1352, 1562.) Plaintiff's treating physician examined Plaintiff's upper and lower extremities on both sides and noted only that Plaintiff's right first MTP joint was acutely inflamed. (R. 1352, 1564.) On October 7, 2020, Plaintiff sought treatment in an emergency room because of pain in his feet. (R. 1468-1469.) He denied any chest pain, shortness of breath, abdominal pain, nausea, or vomiting. (R. 1471-1472.) A blood test showed that Plaintiff's uric acid and white blood count levels were elevated, but he presented no symptoms of infection. (R. 1469.) X-ray imaging of Plaintiff's left ankle and right foot showed normal joint spacing and alignment. (R. 1469, 1504-1505.) Plaintiff's physician noted Plaintiff walked with a normal gait. (R. 1475.) The physician determined Plaintiff likely was suffering from gout in both of his feet, prescribed a steroid and pain relief medication, and advised him to follow-up with his primary care provider. (R. 1469.) On October 13, 2020, Plaintiff again sought treatment in a clinic related to a moderately severe gout flare affecting joints in his ankle and toes. (R. 1638.) Plaintiff's treating physician suggested he restart a medication to treat his gout. (R. 1638.) Plaintiff had discontinued the gout medication due to known interactions with one of his kidney medications, but his physician believed it would be safe for Plaintiff to take it in small doses. (R. 1638.)

In February 2021, Plaintiff had a virtual care visit with a physician who evaluated Plaintiff's gout and noted: (1) Plaintiff had "made gradual improvement"; (2) the frequency of Plaintiff's gout flare-ups had diminished; (2) Plaintiff was taking prescribed medication without any side effects; (3) Plaintiff was able to fully flex his digits into fists bilaterally; (4) Plaintiff had

normal range of motion in his wrist and elbow; and (5) Plaintiff's shoulder abduction appeared normal. (R. 1680-1682.) Further, a laboratory result from late January showed Plaintiff's creatinine level was within the normal range at 1.09 mg/dl. (R. 1682.)

### 2. Nephrology Clinic Treatment

In October 2019, Plaintiff visited a nephrology clinic for treatment of focal segmental glomerulosclerosis ("FSGS") after a recent sudden onset of edema fatigue. (R. 883.) Plaintiff's medical notes indicate he had a history of nephrotic syndrome dating back to at least 2013. (R. 884.) During his visit with a nurse practitioner, Plaintiff explained he had stopped taking an immunosuppressive medication to treat his FSGS for over a year, in part due to its cost. (R. 883.) He explained he also was not taking the medicine to treat his gout because he had run out of that as well. (R. 883.) Plaintiff reported he was overwhelmed by his kidney disease, his personal responsibilities, and the expense of life in general. He expressed interest in a low-dose antidepressant. (R. 883.) Plaintiff's care provider examined him and noted his edema was controlled with medication and that he had normal range of motion in his lower and upper extremities. (R. 884.) She also instructed that it was imperative Plaintiff take his prescribed medication. (R. 883.)

Plaintiff returned to the clinic on November 25, 2019. (R. 895.) Plaintiff reported that: (1) he developed several unpleasant symptoms after starting his prescribed kidney medication; (2) he had recently visited the emergency room twice for shortness of breath; (3) parts of his body were swollen; and (4) he was very stressed about his illness, work, and family life. (R. 895.) His serum creatinine levels were elevated, but his care provider noted this could be due to poor oral intake and his history of noncompliance with medications. (R. 896.) Plaintiff returned to the clinic on December 9, 2019 and explained he had been unable to take any of his medication for two

weeks because insurance would not cover them.  (R. 908.)  He reiterated that he felt stress related to his illness, work, and family life.  (R. 908.)

Plaintiff visited the clinic again in January 2020.  He reported he had quit his job because of stress related to his medical issues and was suffering from significant depression.  (R. 919.) Plaintiff said his attempts to take prescribed medications were thwarted when he ran out and insurance would not refill them.  (R. 919.)  Plaintiff's medical provider noted he seemed to perseverate about his non-renal issues, particularly his multi-joint pain and low back issues. (R. 919-920.)  During a visit in February 2020, Plaintiff reported that he was recently seen in emergency room to evaluate dark urine but tests reflected trace protein and no evidence of hematuria.  (R. 931.)  He also stated that he was compliant with his medications and denied any edema, shortness of breath, or orthopnea.  (R. 931.)  Plaintiff's care provider noted Plaintiff's creatinine and protein levels were stable.  (R. 932.)  Plaintiff visited the nephrology clinic again in April and May 2020.  (R. 1276, 1283.)  At each visit, his creatine level was slightly elevated above his normal baseline.  (R. 1277, 1286.)  In April, Plaintiff's musculoskeletal evaluation showed no evidence of inflammation in joints or muscle tenderness (R. 1277), and in May, it showed Plaintiff had normal range of motion and normal strength (R. 1286).  Plaintiff's care provider determined that his nephrotic syndrome was likely secondary to a relapse of FSGS and discussed various treatment options.  (R. 1277.)

### 3.    Dr. Kamal's Treatment

On December 9, 2019, Dr. Kamal treated Plaintiff in a medical clinic for nephrotic syndrome, acute gouty arthritis, and adjustment disorder with anxious mood. (R. 987- 990, 1143- 1145.)  Dr. Kamal noted, "[Plaintiff] reports his kidney function deteriorated suddenly last week."  (R. 988, 1143.)  She advised him to return in one month.  (R. 988, 1143.)

Plaintiff followed up with Dr. Kamal on January 27, 2020. (R. 964-965, 1114-1115.) Dr. Kamal noted Plaintiff had numbness and tingling in both of his legs but he retained full power and was able to stand up on his forefeet without diminished reflexes. (R. 964-965, 1114-1115.) She also opined that Plaintiff's "main problem" was "anxiety and depression." (R. 964, 1114.) She prescribed a low-dose antidepressant, which Plaintiff agreed to try. (R. 964, 1114.) Dr. Kamal further opined that another "big problem" was Plaintiff's "lack of [medication] compliance that goes over and beyond just insurance problems." (R. 964, 1114.) Plaintiff met with Dr. Kamal again on February 27, 2020 because of chronic gout-related pain. (R. 942, 1082.) According to her notes, Plaintiff reported that the pain made it difficult for him to get out of bed and caused his hands to feel numb. (R. 942, 1083.) He also reported increased feelings of anxiety and depression, and difficulties in his personal life. (R. 942, 1083.) Dr. Kamal noted Plaintiff had pain in his shoulder related to a rotator cuff injury and still had numbness in his legs. (R. 941- 942- 1082- 1083.)

After a telephone visit in April 2020, Dr. Kamal noted Plaintiff continued to suffer from chronic back pain and "edema from head to toe." (R. 1307.) She also noted Plaintiff had "ongoing exertional shortness of breath, polyathrlagias and muscle pain and low appetite and nausea." (R. 1307.) She determined he was experiencing side effects related to one of his kidney medications. (*Id.*) Plaintiff had a video appointment with Dr. Kamal in August 2020. (R. 1357 1358.) Dr. Kamal noted Plaintiff had a gout-flare in his toes and was "miserable due to discomfort." (R. 1358.)

Plaintiff had another appointment with Dr. Kamal on October 9, 2020, two days after he sought emergency treatment for gout-related pain in his feet. (ECF No. 1653.) Dr. Kamal noted Plaintiff's acute and chronic gout pain had subsided with higher steroid doses, but she stated that

his ankle was still painful and swollen with limited movement, and that he was still using crutches. (R. 1653-1654.) She indicated concern that Plaintiff might not be responsive to conventional treatment, but she noted he may not have been compliant with his prescribed medication. (R. 1653.) Dr. Kamal further remarked that Plaintiff's nephrotic syndrome due to FSGS was deemed in remission with medication. (R. 1653.)

Dr. Kamal treated Plaintiff again on October 30, 2020 and noted, "We have finally come up with a regimen that seems to help" Plaintiff's "consistent problems with chronic tophaceous gout." (R. 1586.) She stated that the medication made such a "dramatic improvement" for Plaintiff he was able to walk without crutches. (R. 1588.) Dr. Kamal also noted Plaintiff's "anxiety and depression [were] doing well" (R. 1587), and he was not experiencing any "peripheral edema" (R. 1589).

Dr. Kamal evaluated Plaintiff again in March 2021 and noted Plaintiff was experiencing shoulder pain related to a rotator cuff injury but had not had a recent gout attack. (R. 1676.) She also noted that he was seeking disability. She stated that she had advised him to fill in the forms but that she could not assess full workability. (R. 1676.) Her notes from this visit do not reflect that she examined Plaintiff's joints. (R. 1676-1677.)

### B. Dr. Kamal's Medical Opinion

Dr. Kamal completed a Physical Medical Source Statement on April 19, 2021 ("Dr. Kamal's Medical Opinion") (R. 1688-1692). She identified the following conditions: "medication side effects, immunosuppressants, severe gout after flare ups, and low back degenerative disease," (R. 1689) to support the following limitations: (1) maximum ability to lift or carry no more than 20 pounds on an occasional basis; (2) maximum ability to lift or carry less than 10 pounds on a frequent basis; (3) maximum ability to stand or walk (with normal breaks) about 2 hours during

10

an 8-hour day; (4) maximum ability to sit (with normal breaks) for about 3 hours during an 8-hour day; (5) periodically alternating sitting, standing, or walking to relieve discomfort insofar as Plaintiff could sit for 20 minutes before changing position, stand for 30 minutes before changing position, and walk for approximately 15 minutes between changing position; and (6) requiring that Plaintiff have the opportunity to shift from sitting or standing at will.  (R. 1689).  Dr. Kamal also stated that Plaintiff would occasionally need to lie down at work due to "pain, headaches, dizziness, fatigue," and would also need to elevate his feet/legs "waist high" during a work shift.  (R. 1689.)

Dr. Kamal further opined that Plaintiff's "rotator cuff pain, gout, [and] side effects to kidney medicines" affected Plaintiff's ability to reach (including overhead), handle, finger, feel, and push/pull, and that while Plaintiff could frequently rotate and flex his neck, he could only occasionally twist, stoop, crouch, climb stairs, climb ladders, and repetitively control his feet. (R. 1690.)  Dr. Kamal specified that these activities caused Plaintiff "joint pain, numbness, and soreness."  (R. 1690.)

Dr. Kamal also recommended the following environmental restrictions because certain environmental factors exacerbated Plaintiff's joint pain and affected his ability to concentrate: (1) avoid concentrated exposure to vibration and hazards such as heights and machinery; and (2) avoid moderate exposure to extreme cold, extreme heat, humidity, and fumes, odors, dusts, gases, and poor ventilation.  (R. 1691.)  Dr. Kamal also stated Plaintiff's impairments made him "unable to concentrate," and "sometimes unable to make good judgment."  (R. 1691.)  She further stated Plaintiff's impairments dated back to at least November 15, 2019 (R. 1692) and were likely cause him to be absent from work more than three times per month (R. 1691).

### C.    Prior Administrative Medical Findings

In connection with Plaintiff's initial application, Dr. James Dvorak, a state agency physician who assessed Plaintiff's RFC, determined that Plaintiff suffered from the following impairments: (1) severe degenerative back disease; (2) severe chronic kidney disease; (3) severe dysfunction of major joints; and (4) non-severe depressive, bipolar, and related disorders.  (R. 575.)  Dr. Dvorak concluded Plaintiff had exertional limitations insofar has Plaintiff could: (1) occasionally lift and carry up to 20 pounds; (2) frequently lift and carry up to 10 pounds; (3) stand and/or walk (with normal breaks) for about 6 hours in an 8-hour day; (4) sit (with normal breaks) for about 6 hours in an 8-hour day; and (4) occasionally push and/or pull with his left upper extremity.  (R. 577-579.)  Dr. Dvorak also concluded Plaintiff had: (1) postural limitations insofar as Plaintiff could only occasionally: (1) climb ramps and stairs; (b) climb ladders, ropes, or scaffolds; (c) balance; (d) stoop, (e) kneel, (f) crouch; and (g) crawl; and (2) manipulative limitations insofar as Plaintiff could occasionally reach with his left upper extremity. (R. 577- 588.)  At the reconsideration level, Dr. Carolyn Hildreth identified the same severe and non-severe impairments and largely agreed with Dr. Dvorak's RFC, but differed insofar as she: (1) concluded Plaintiff could only stand and/or walk (with normal breaks) for about 2 hours in an 8-hour day; (2) limited Plaintiff to occasional push/pull with either lower extremity; and (3) limited Plaintiff to work environments where he could avoid concentrated exposure to extreme cold, vibration, and hazards.  (R. 615-616.)

## III.    Administrative Hearing

During his hearing on March 25, 2021, Plaintiff stated that he was previously self-employed as an auto mechanic but stopped working in November 2019 after becoming ill and unable to keep up with his bills or clients.  (R. 549-550.)  Plaintiff explained that he suffered from

frequent gout flare-ups that lasted from four days to a month and caused unbearable pain, making it difficult for him to complete basic tasks or maintain any form of employment. (R. 551- 554, 561.)  He stated the pain caused him to experience migraine headaches, impeded his ability to walk, sit and sleep, and impaired his ability to focus.  He said sometimes he did not eat or drink because it was so painful to walk to the restroom.  (R. 551-552.)  Plaintiff also said he relied on a cane, crutches, or scooter to walk, and that he continuously needs to switch from a standing to a seated position.  (R. 552, 562.)  Plaintiff further testified that while his gout was primarily in his knee and foot, he also suffered shoulder pain due to torn rotator cuffs and back pain that numbed his feet.  (R. 557-558.)  He additionally mentioned blurred vision that may be a side effect from his kidney medication (R. 554), and shortness of breath while performing basic activities (R. 562).

Following Plaintiff's testimony, vocational expert Sara Gibson testified that a hypothetical person with Plaintiff's age, education, and work experience who was limited to:  (1) occasionally exerting 20 pounds; (2) frequently exerting 10 pounds; (3) standing or walking just two hours out of eight; (4) occasionally climbing ramps and stairs, ladders, and ropes or scaffolds; (5) occasionally balancing, stooping, kneeling, crouching, and crawling; (6) occasional use of foot of foot controls; and (7) avoiding concentrated exposure to extreme cold, vibration, and hazards such as machinery and heights could not perform Plaintiff's past relevant work.  She further testified, however, that the hypothetical person could perform sedentary, unskilled work in occupations such as document preparer, telephone clerk, or order clerk—each of which would permit Plaintiff to use an assistive device to ambulate.  (R. 563-564.)  Ms. Gibson further testified that if the hypothetical person needed to miss work more than one-and-a-half days per month, including coming in late and leaving early, that person would be precluded from competitive

13

employment.  (R. 564-565.)

## IV.    The ALJ's Written Decision

The ALJ issued a written decision on June 1, 2021 finding Plaintiff not disabled. (R. 11–23.)  Pursuant to the five-step sequential analysis outlined at 20 C.F.R. §§ 404.1520(a), and 416.920(a),[3] the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset date of his disability; (2) suffered from the following impairments that, at least in combination, were severe: degenerative disc disease of the lumbar spine; chronic kidney disease with gout; and degenerative joint disease of the left shoulder; (3) did not have a listed impairment or a combination of impairments that met or medically equaled a listed impairment as defined in 20 C.F.R. Part 404, Subpart P, Appendix I ("Listing of Impairments" or "Listing")[4]; (4)  could not perform any of his past work but retained the functional capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567(a) and 416.967(a)[5] except would be limited for standing or walking just two hours out of 8; occasional climbing of ramps or stairs; occasional climbing of ladders, ropes, or scaffolds; occasional balancing; occasional stooping, kneeling, crouching, and crawling; only occasional use of foot controls; avoid

---

[3]  The five steps are: (1) whether the claimant is doing work that qualifies as substantial gainful activity; (2) the medical severity of the claimant's impairments; (3) whether one or more impairments meets or medically equals the criteria of a listed impairment, and meets the duration requirement; (4) the claimant's RFC and whether he can perform past relevant work; and (5) the claimant's RFC and whether he can make an adjustment to other work.   20 C.F.R. § 416.920(a)(4)(i)–(v).

[4]  The Listing of Impairments is a catalog of presumptively disabling impairments categorized by the relevant "body system" impacted.  *See* 20 C.F.R Part 404, Subpart P, App. 1.

[5]  While the ALJ used the term "light work" in this part of his Decision, he cited the definition for "sedentary work." *See* 20 C.F.R. §§ 404.1567(a), 416.967(a).  Based on the Decision as a whole, the Court infers that the ALJ intended to indicate "sedentary" work.  (*See, e.g.*, R. 22, discussing Plaintiff's ability to adjust to sedentary work.)  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  20 C.F.R. § 404.1567(a).  A sedentary job is not limited to sitting; it may also include occasional walking and standing if other sedentary criteria are met.  *Id.*

concentrated exposure to extreme cold, vibration; and hazards such as machinery and heights;

and (5) was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (R. 22-23.) Based on these findings the ALJ concluded Plaintiff was not disabled. (R. 23.)

To determine Plaintiff's RFC, the ALJ considered the entire record, including Plaintiff's reported symptoms and limitations, as well as medical opinion evidence and prior administrative medical findings. (R. 17-21.) The ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not generally consistent with the medical evidence and other evidence in the record. (R. 18.) The ALJ noted Plaintiff's gout condition improved within twelve months of the alleged onset date and his kidney condition remained stable when he was fully compliant with medications. (R. 18.)

The ALJ specifically observed that by February 2021: (1) Plaintiff's conditions had had made gradual improvement; (2) the frequency of Plaintiff's gout episodes had diminished; (3) Plaintiff had not had adverse side effects from drug interactions; (4) Plaintiff's creatinine level had improved to 1.09; and (5) Plaintiff was able to fully flex his digits into fists bilaterally, his wrist and elbow range of motion appeared normal, and abduction of his shoulder was normal. (R. 20, citing R. 1680-1682.) He also noted that a January 2020 MRI of Plaintiff's lumbar spine did not show spinal cord or nerve root impingement, and in October 2020 x-rays of Plaintiff's right foot and left ankle showed normal joint spaces and he walked with a normal gait. (R. 20, citing R. 1475, 1504-1505.) The ALJ further remarked that Plaintiff retained full strength and range of motion in his upper and lower extremities during different physical exams. (R. 20, citing, *e.g.*, R. 1286.)

The ALJ determined that the course of Plaintiff's treatment related to his physical impairments during the relevant timeframe did not suggest any additional limitations to Plaintiff's RFC were necessary, in part because Plaintiff: (1) did not undergo any surgeries (nor were any discussed as being necessary in the future); (2) was not hospitalized for the physical impairments or for having intractable pain; and (3) had a short course of physical therapy for the degenerative disc disease and received only a few steroid injections. (R. 20.) The ALJ concluded that despite Plaintiff's impairments, he could stand and/or walk for two hours out of an eight-hour day with normal breaks, and that it was not necessary for Plaintiff to use crutches or other assistive walking devices in the workplace. (R. 20, citing, *e.g.*, R. 1586.) The ALJ also explained that he accounted for Plaintiff's gout flares and kidney condition by limiting Plaintiff's postural abilities to occasional, but he did not find the record supported manipulative restrictions since Plaintiff's treatment for degenerative disc disease and left shoulder conditions was minimal. (R. 20.)

The ALJ also explained his consideration of medical opinion evidence and prior administrative findings, including whether and how they persuaded him. (R. 20.) He specifically stated that he "did not defer of give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources." (R. 20.)

The ALJ found the prior administrative findings mostly persuasive, but he found Dr. Hildreth's findings at the reconsideration level more persuasive because they limited Plaintiff to just two hours of time on his feet and included environmental limitations. (R. 20, citing R. 577-588, 615-616.) The ALJ remarked that he did not find the left overhead restrictions espoused in the initial level findings to be supported by the record given Plaintiff's lack of treatment and minimal objective findings related to Plaintiff's left shoulder. (R. 20.) The ALJ agreed that no

additional limitations were necessary because: (1) Plaintiff's claims of having gout flares once per month, being able to walk only 75-feet, having shortness of breath upon exertion, and needing to continuously switch from standing to the seated position were not persuasive or supported by objective medical evidence; and (2) Plaintiff's kidney condition stabilized with medication compliance and his gout improved within twelve months from the alleged onset date after starting a new medication.  (R. 20-21.)

The ALJ also explained that he considered Dr. Kamal's Medical Opinion with stricter limitations, listing each one, but found it unpersuasive.  He made this finding because of the March 2021 medical note, stating "I did tell [Plaintiff] to fill the [disability] forms but I cannot really assess full workability," because she noted in March 2021 that Plaintiff "has not had a recent gout attack," and because she did not evaluate Plaintiff's joints at that time.  (R. 21, citing R. 1676, 1688-1692.)  The ALJ noted that Plaintiff had not had recent flares of his kidney condition and that medication was effective to stabilize his gout without side effects.  (R. 21, citing R. 1680, (February 2021 medical note that Plaintiff did not suffer side effects from his gout medication).)

The ALJ did not find Dr. Kamal's limitation to occasional handling/fingering was supported because: (1) there was no mention of any upper body abnormality when Plaintiff's extremities were examined (R. 21, citing R. 1564 (joint abnormality limited to Plaintiff's foot)); (2) his left shoulder findings were minimal; (3) medical notes related to Plaintiff's digits reflected a full range of motion without discomfort (R. 21, citing R. 1478 (October 9, 2020 medical note that Plaintiff's "digits show[ed] full range of motion without discomfort"), R. 1680 (February 2021 medical note that Plaintiff was able to fully flex his digits into fists bilaterally)); and (4) in February 2021, another provider noted Plaintiff's range of motion in his wrist and elbow, and Plaintiff's shoulder abduction appeared normal (R. 21, citing R. 1680 (February 2021 medical note

17

related to Plaintiff's upper extremities)).

The ALJ similarly explained he did not find Dr. Kamal's opinion that Plaintiff needed to elevate his feet supported because: (1) when Dr. Kamal evaluated Plaintiff in October 2020 she noted he was not experiencing any peripheral edema (R. 21, citing Dr. Kamal's October 30, 2020 medical note); (2) while there was reference to pedal edema earlier in records and notes from January to February 2020 indicating Plaintiff used compression stockings at home, "later medication seems to have improved this and compression stockings were not mentioned elsewhere apart from education on [preventing blood clots] during a hospitalization in October 2020 (R. 21, citing R. 1664 (education on blood clot prevention)); and (3) Plaintiff's only medical records that discussed elevating his foot followed an acute injury months before the alleged onset date of his disability (R. 21, citing R. 1446 (medical notes related to foot injury in July 2019)).

## DISCUSSION

### I.    Legal Standard

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or whether the ALJ's decision resulted from an error of law. *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions." *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)). The Supreme Court explained:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence … is

18

more than a mere scintilla.  It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019).  "[The] Court considers evidence that detracts from the Commissioner's decisions, as well as evidence that supports it." *Nash*, 907 F.3d at 1089 (quoting *Travis*, 477 F.3d at 1040).  "If substantial evidence supports the Commissioner's conclusions, [the] Court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* (quoting *Travis*, 477 F.3d at 1040).  In other words, "if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings, [the Court] must affirm the decision." *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting *Cruz v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996)).

A claimant has the burden to prove disability.  *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995).  The claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The disability, not just the impairment, must have lasted or be expected to last for at least twelve months.  *Barnhart, v. Walton*, 535 U.S. 212, 217-22 (2022); *see also*, *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

It is also the claimant's burden to prove his functional limitations related to his RFC. *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003) (citing *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)); *accord Charles v. Barnhart*, 375 F.3d 777, 782 n.5 (8th Cir. 2004).  RFC is defined as the most a claimant can do despite his limitations.  20 C.F.R. § 404.1545(a).  The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others,

and a claimant's own descriptions of her limitations.  *See*  20 C.F.R. § 404.1545(a)(3); *see also*, *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016); *Roberts v. Apfel*, 222 F.3d, 466, 469 (8th Cir. 2000).

Under regulations revised in 2017, an ALJ cannot defer or give any specific evidentiary weight, including controlling weight, to any medical opinion or prior administrative medical finding, including those from medical sources.  20 C.F.R. § 404.1520c (a); *see also Bowers v. Kijakazi*, 40 F.4th 872, 875 (8th Cir. 2022 ) (citing 20 C.F.R. § 404.1520c(c), "treating physicians are [no longer] entitled to special deference").  When evaluating the persuasiveness of medical opinions and prior administrative findings, an ALJ must consider: (1) whether they are supported by objective medical evidence; (2) whether they are consistent with other medical sources; (3) the relationship the source has with the claimant; (4) the source's specialization; and (5) any other relevant factors.  *Bowers*, 40 F.4th at 875 (citing 20 C.F.R. § 404.1520c(c)).  The first two factors—supportability and consistency—are the most important, and the ALJ generally need only explain how he considered those two factors.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).

"Supportability" addresses the extent to which the medical source offering the opinion or prior administrative medical finding provides objective medical evidence and supporting explanations.  20 C.F.R. § 404.1520c(c)(1).  "Consistency" addresses the extent to which the opinion or prior administrative medical finding is consistent with the other record evidence from other medical and non-medical sources.  20 C.F.R. § 404.1520c(c)(2).

"Because a claimant's RFC is a medical question, an ALJ's assessment must be supported by some medical evidence of the claimant's ability to function in the workplace."  *Hensley*, 829 F.3d at 932 (quoting *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)).  The "ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence

from a [medical] professional." *Baldwin*, 349 F.3d at 556.  The ALJ must determine the claimant's RFC based on all of the relevant medical *and* non-medical evidence.  *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016); 20 C.F.R. § 404.1545(a)(3).  An ALJ's RFC determination is acceptable if it is supported by at least some medical evidence based on the ALJ's independent review of the record.  *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002).

## II.    Analysis

Plaintiff argues the ALJ violated 20 C.F.R. 404 § 404.1520c by failing to properly explain how Dr. Kamal's notes and additional supporting explanations affected his evaluation of the persuasiveness of Dr. Kamal's Medical Opinion.  (ECF Nos. 21 at 7-11; 26 at 2-3.)  Plaintiff contends Dr. Kamal's Medical Opinion "clearly outline[d] unambiguous limitations that ultimately would prevent [Plaintiff] from sustaining competitive employment," and that "while the ALJ may have superficially discussed the mandatory supportability and consistency factors [set forth in section 404.1520c(c)], the ALJ did not engage in any meaningful review."  (ECF Nos. 21 at 7-9; 26 at 2.)  He argues the ALJ "focused on a very limited portion of the record and neglected to review the entirely of the record," and "at best, the ALJ restricted his review of the record to the most recent records."  (ECF Nos. 21 at 11.)  Plaintiff asserts, "the ALJ's selective reading of the record should not be considered a proper evaluation of the supportability factor."  (ECF No. 26 at 2.)  Plaintiff further contends the ALJ needed to evaluate the supportability and consistency factors separately, and was required to provide an analysis that allows a subsequent reviewer to trace the path of the ALJ's reasoning.  (ECF No. 26 at 2.)  The crux of Plaintiff's argument is that the ALJ's findings are not based on substantial evidence because he failed to evaluate Dr. Kamal's Medical Opinion properly.  (ECF Nos. 21 at 9; 26 at 1.)

The Court finds the ALJ properly evaluated Dr. Kamal's Medical Opinion, and specifically

finds the ALJ properly explained the supportability and consistency factors under 20 C.F.R. § 404.1520c. The Court also concludes that substantial evidence supports the ALJ's findings.

First, the Court finds the ALJ's review of Dr. Kamal's Opinion was careful and thorough. After reviewing the limitations in Dr. Kamal's Medical Opinion, the ALJ detailed specific evidence underlying his determination that certain limitations set forth in her opinion were unsupported by the record. (R. 20.) He explained he did not find Dr. Kamal's limit to occasional handling/fingering was supported because: (1) there was no mention of any upper body abnormality when Plaintiff's extremities were examined (R. 21, citing R. 1564 (joint abnormality limited to Plaintiff's foot)); (2) Plaintiff's left shoulder findings were minimal; (3) medical notes related to Plaintiff's digits reflected a full range of motion without discomfort (R. 21, citing R. 1478 (October 9, 2020 medical note that Plaintiff's "digits show[ed] full range of motion without discomfort"); R. 1680 (February 2021 medical note that Plaintiff was able to fully flex his digits into fists bilaterally)); and (4) in February 2021, another provider noted Plaintiff's range of motion in his wrist and elbow and determined Plaintiff's shoulder abduction appeared normal (R. 21, citing R. 1680 (February 2021 medical note related to Plaintiff's upper extremities)).

The ALJ similarly explained he did not find Dr. Kamal's opinion that Plaintiff needed to elevate his feet was supported because: (1) when Dr. Kamal evaluated Plaintiff in October 2020 she noted that he was not experiencing any peripheral edema (R. 21, citing Dr. Kamal's October 30, 2020 medical note); (2) while there was reference to pedal edema earlier in the record, and notes from January to February 2020 indicate Plaintiff used compression stockings at home, "later medication seems to have improved this and compression stockings were not mentioned elsewhere apart from education on [preventing blood clots] during a hospitalization in October 2020 (R. 21, citing R. 1664 (education on blood clot prevention)); and (3) Plaintiff's only

22

medical records that discussed elevating his foot followed an acute injury months before the alleged onset date of his disability (R. 21, citing R. 1446 (medical notes related to foot injury in July 2019)). The ALJ plainly considered Dr. Kamala's opinion and explained his rationale for rejecting portions of her findings with citations to evidence in the record.

The ALJ further explained that he found the overall persuasiveness of Dr. Kamal's Medical Opinion undercut by: (1) her written statement in March 2021 that "I did tell [Plaintiff] to fill the [disability] forms but I cannot really assess full workability"; (2) her March 2021 medical note that Plaintiff "has not had a recent gout attack,"; and (3) the fact that Dr. Kamal did not evaluate Plaintiff's joints in March 2021.  (R. 21, citing R. 1676, 1688-1692.)  The ALJ also cited evidence that Plaintiff had not had recent flares of his kidney condition and that medication was effective to stabilize his gout without side effects.  (R. 21, citing R. 1680 (February 2021 medical note that Plaintiff did not suffer side effects from his gout medication).)

Plaintiff contends the ALJ did not sufficiently discuss the mandatory supportability and consistency factors and that a more meaningful review would have led him to find Dr. Kamal's Medical Opinion consistent with the record as a whole.  The Court disagrees.  The ALJ offered a detailed explanation of why and to what extent he found Dr. Kamal's Medical Opinion unsupported and cited specific record evidence of inconsistencies with her Opinion.  Moreover, the ALJ was not required to defer to or to give Dr. Kamal's Opinion any controlling evidentiary weight.  *Bowers*, 40 F.4th at 875; 20 C.F.R. § 404.1520c(c)).   Plaintiff may disagree with the ALJ's findings, but this does not alter the fact that the ALJ properly evaluated Dr. Kamal's Medical Opinion under 20 C.F.R. 404 § 404.1520c.  *Schmitt v. Kijakazi*, 27 F.4d 1353, 1361 (8th Cir. 2022) ("Despite [Plaintiff's] dissatisfaction with how the ALJ weighed the evidence, it is not this Court's role to reweigh that evidence").

Furthermore, to the extent Plaintiff argues the ALJ neglected to review the entirely of the record, and that the Court should reverse the ALJ's Decision because substantial evidence supports a more restrictive RFC overall (*see* ECF Nos. 21 at 9; 26 at 1), the Eighth Circuit has rejected this argument. The issue "is not whether substantial evidence exists to reverse the ALJ," but "whether substantial evidence supports the ALJ's decision." *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision. *Chesser*, 858 F.3d at 1164; *see also Nash*, 907 F.3d at 1089 ("If substantial evidence supports the Commissioner's conclusions, [the] Court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome.") (quoting *Travis*, 477 F.3d at 1040)). Here, the ALJ properly considered the relevant evidence before him, including Dr. Kamal's Medical Opinion, and his determination that no additional limitations were warranted is supported by substantial evidence.

## CONCLUSION

For the foregoing reasons the Court finds the ALJ properly evaluated Dr. Kamal's Medical Opinion and that substantial evidence in the record as a whole supports the Decision. The Court accordingly recommends that Plaintiff's motion for summary judgment (ECF No. 20) be denied, the Commissioner's motion for summary judgment (ECF No. 23) be granted, and the Decision be affirmed.

## RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's motion for summary judgment (ECF No. [20]) be **DENIED**;

2.    The Commissioner's motion for summary judgment (ECF No. [23]) be **GRANTED**;

3.    The Decision be **AFFIRMED**; and

4.    Plaintiff's Complaint (ECF No. [1]) be **DISMISSED WITH PREJUDICE**.


Dated: May 22, 2023                  *s/ Dulce J. Foster*
                                     DULCE J. FOSTER
                                     United States Magistrate Judge


## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.  Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in LR 72.2(c).